UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

THOMAS MATTHEW PHILLIPS, SR., aka PAP'S          Case No. DG 07-07387
EXPRESS FREIGHT, LLC and NICOLE MARIE            Hon. Scott W. Dales
PHILLIPS, aka NICOLE MARIE COOK,                 Chapter 7

        Debtors.

_____/

RANDY C. WEISSERT,                               Adversary Pro. No. 07-80661

        Plaintiff,

v.

NICOLE M. PHILLIPS and
THOMAS MATTHEW PHILLIPS,

        Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

    I.    Introduction and Jurisdiction

This adversary proceeding arises out of a state court civil complaint filed by Randy Weissert ("Randy") alleging abuse of process, intentional infliction of emotional distress, civil conspiracy and concert of action (the "Civil Complaint"). In 2002, Randy was arrested and charged with criminal sexual conduct in the third degree ("CSC3") after Defendant Nicole Phillips ("Nicole") accused him of raping her one year earlier. He was tried in the Montcalm County Circuit Court on January 22 and 23, 2003, and acquitted. On April 20, 2007, Randy filed the Civil Complaint against Nicole and her

boyfriend Thomas Phillips, Sr. ("Tom").   Tom and Nicole (the "Defendants") are now married.

Though Nicole and Tom were properly served, they failed to answer the Civil Complaint, and on July 6, 2007 the state court entered a default against them. On August 6, 2007 the state court held a fact-finding hearing on damages at which the Defendants appeared. On August 22, 2007, the state court entered judgment against each of the Defendants for $71,962.75, or $143,925.50 in the aggregate (the "Judgment").   The Defendants filed a joint Chapter 7 bankruptcy petition on October 8, 2007. Randy seeks to except the Judgment from discharge pursuant to 11 U.S.C. § 523(a)(6) as a debt for willful and malicious injury, grounded in malicious prosecution and related theories.

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b), and authority to enter final judgment in this core proceeding under 28 U.S.C. § 157(b)(2)(I). Except as otherwise noted, Part V of this opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[1]

II.    Motion for Summary Judgment

On August 18, 2008, the Defendants filed a Motion for Partial Summary Judgment requesting that this court find the state court default judgment had no

---

[1] Federal Rule of Bankruptcy Procedure 7052 makes Federal Rule of Civil Procedure 52 applicable to this adversary proceeding.   The court has organized the opinion principally, though not exclusively, by witness. Given the inconsistent nature of much of the testimony, however, large portions of this opinion simply report the various versions, reciting point and counterpoint, without necessarily adopting the reported testimony as established fact.

preclusive effect because it was not actually litigated. On October 23, 2008, the court issued an order declaring that the state court judgment established only the amount of damages and the Defendants' liability, but did not establish for purposes of this adversary proceeding the nature of the debt as one for willful and malicious injury to Randy. From February 23 to February 25, 2009, the court held a two and a half day trial in Grand Rapids, Michigan, to decide that issue.

III.    Burden of Proof

In a non-dischargeability action the plaintiff has the burden of proof by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).   In this adversary proceeding, with the allegation sounding principally in false arrest or malicious prosecution, Randy has the difficult task of proving a negative, as his counsel conceded in his opening argument. Because Nicole's defense is premised on rape, Randy must prove by a preponderance of the evidence that he did not rape Nicole.  If he succeeds, it follows that the criminal prosecution Nicole and possibly Tom orchestrated was wrongful, and that the damage claim established in the state court arises from a willful and malicious injury within the meaning of 11 U.S.C. § 523(a)(6).  If Randy did not assault Nicole, the debt represented by the Judgment should be excepted from discharge, at least as to Nicole, since she was the complaining witness in Randy's criminal case.  The analysis as to Tom differs slightly.

Because Tom was not the complaining witness in the criminal case, even if the court finds that Nicole lied to the criminal authorities, that finding alone will not inculpate

Tom. Rather, in order to except the debt from Tom's separate discharge, Randy must prove that Tom caused him injury by conspiring with Nicole to abuse the judicial process. Consequently, to except the entire amount represented by the Judgment from the Defendants' discharges, the court must determine that Randy has proven that Nicole and Tom together committed an intentional tort or crime that had an unlawful purpose, or that had a lawful purpose but was accomplished by criminal or unlawful means. <u>Temborius v. Slatkin</u>, 157 Mich. App. 587, 599-600 (1986).

## IV.    Background and Issues

At the bankruptcy trial Randy,[2] Nicole, and Tom[3] all testified. The court also heard testimony from four non-party witnesses: Randy's friend, Bonnie Jones[4] ("Bonnie"); Randy's mother, Gail Weissert ("Gail"); a nurse from the Grand Rapids YWCA rape crisis center, Sue Shattuck ("Nurse Shattuck"); and a former Montcalm County sheriff's deputy, Brian Grill ("Deputy Grill"). The court found a large part of the testimony to be unreliable and disjointed due in part to dimming memories, a lack of veracity, bias, and with respect to Randy and Bonnie, probably substance abuse. Nevertheless, through the admittedly hazy recollections, a sordid picture emerges of a troubled young woman in need of attention, a depressed and peripatetic middle-aged

---

[2] Randy has been convicted of two felonies in Indiana for non-payment of child support. This is not considered a felony in Michigan. His record also reflects one felony for possessing marijuana. <u>See</u> Fed. R. Evid. 609.

[3] Ironically, Tom was convicted on December 4, 2000, of CSC3 pursuant to M.C.L.A. § 750.520d with multiple variables for an event that occurred on June 11, 2000. This was the same statute Randy was prosecuted under, but without the variables. Tom was sentenced to 5 months in jail and 5 years probation. <u>See</u> Fed. R. Evid. 609.

[4] Bonnie was convicted in October 2001 of manufacturing with intent to deliver marijuana. She was sentenced to 28 days in jail and 3 years probation. <u>See</u> Fed. R. Evid. 609.

man and an evening of drinking that culminated in either a heinous rape, or an insidious and false accusation of rape. Randy's memory is clouded and his testimony, inconsistent with prior testimony; Nicole gave inconsistent contemporaneous reports, and continues to change her story as time wears on, adding and omitting significant details without adequate explanation. Nicole's then-boyfriend and present husband, himself a convicted sex offender, takes his wife's side. The physical evidence of rape is equivocal. This is a difficult case -- difficult to remember, difficult to recount, difficult to argue, difficult to hear, and difficult to decide. The court must make its findings based on the record presented, observing demeanor, attempting to reconcile inconsistencies, and drawing reasonable inferences.

Sometime in 2001, eighteen-year-old Nicole and thirty-eight-year-old Randy met at a mental health facility in Carson City, Michigan. Both independently checked themselves in, seeking treatment for depression. While Nicole only stayed at the hospital overnight, Randy was there for approximately one week. They attended at least one group therapy session together and talked to each other in a common room where they apparently exchanged phone numbers. In the remarkably short duration of Nicole's 24-hour hospital stay, she says she and Randy became fast friends, sharing the common experience of depression. Although Randy claims he never talked with or saw Nicole outside of the hospital until the night in question, Nicole claims they spoke fairly often, saw each other on occasion, and that Randy actually stayed at her apartment for approximately three days when he was in between dwellings. She claims they woke up next to each other in her apartment, naked, several weeks before the

events at issue in this proceeding; he denies he ever spent time in her apartment. She does not recall the circumstances or how they came to share her bed.

At the time of the alleged rape, Randy lived in an outbuilding or garage on his parents' property, which the parties referred to as the "Quonset Hut" (the "Hut"). The Hut is situated approximately 10 to 15 yards from the house where Randy's parents[5] lived (the "Main House").  It consists mainly of a garage stall area, with a small work-area evidently retrofitted as a make-shift one-room apartment. The Hut has no phone or bathroom. Consequently, anyone telephoning Randy had to call his parents' phone in the Main House.

Randy and his mother, Gail, claim that Nicole made unwelcome and incessant telephone calls to Randy, to the point that Gail suspected Nicole was a stalker. Nicole claims that Randy routinely returned her calls and even invited her out.

On Thursday, June 7, 2001, Randy returned home from work at about 4:00 p.m. At the time, Randy was working at Huntington Foam, weekdays from 7:00 a.m. to 3:30 p.m.  Sometime between 4:00 p.m. and 6:00 p.m. Bonnie, a friend since childhood, stopped in unexpectedly, as was her habit. They started sharing a bottle of schnapps called "Hot Damn 100" that Bonnie either brought with her, or Randy picked up at the store on his way home. Although the time frame is foggy, Nicole arrived at the Hut, also without warning or invitation, between 5:00 p.m. and 8:00 p.m.[6] Regardless of the exact

---

[5] Randy's father passed away in May, 2004.
[6] In the bankruptcy trial, Nicole said she arrived between 5:00 p.m. and 7:00 p.m., while in the criminal trial, she said she arrived between 7:00 p.m. and 8:00 p.m.

time, everyone agrees it was light outside throughout most of the evening's alleged events.[7]

By the time Nicole arrived, Randy and Bonnie had each taken at least a couple of swigs of Hot Damn 100.[8]  Nicole also drank some shortly after she entered the Hut, but the parties dispute just how much she drank.[9]  Soon after Nicole got there, Gail came into the Hut,[10] and gave her son a sweatshirt. Not to his liking, Randy offered the sweatshirt to Bonnie. While Gail was in the Hut she noticed that Nicole was sitting very close to Randy with her hands down his pants.[11] Both Randy and Bonnie substantially corroborate this account, though Nicole denies it.[12]

Before Nicole arrived at the Hut that night, Bonnie and Randy decided to go for a ride in Randy's truck because Bonnie wanted to drive it[13] and it gave them something to do. Even though Randy and Bonnie did not explicitly ask Nicole to join them, they did not object when she came along.

---

[7] The court takes judicial notice that on June 7, 2001, the sun set at 9:18 p.m. in Greenville, Michigan. See www.aa.usno.navy.mil; Fed. R. Evid. 201.

[8] Nicole claims Randy and Bonnie were also smoking marijuana, and Bonnie's testimony confirms this; Randy, however, vehemently denies smoking that night.

[9] Nicole was underage and illegally drinking at the time. Her alcohol consumption, and that of her alleged attacker and his childhood friend, casts additional doubt on everyone's judgment, perception, recollection, and recounting of events.

[10] Randy, Nicole and Bonnie all agree Gail came into the Hut. They disagree whether she was alone. In the bankruptcy trial, Randy said his mother was alone, while at the criminal trial he said his sister was also there. Conversely, in the bankruptcy trial Bonnie said Randy's sister was there, while in the criminal trial she said Gail came alone. Yet, in both trials Nicole claims Randy's sister, his niece and a dog were also present.

[11] Gail did not mention this observation to the investigating police officer initially, but did testify to it in both the criminal and bankruptcy trials.

[12] In the bankruptcy trial, Randy said Nicole pulled him on to her lap, but later said she was on his lap. In the criminal trial he said Nicole was sitting close to him and had her hands up his shorts. During the criminal trial, Bonnie stated that Nicole was sitting close to Randy with her arm around him, but in the bankruptcy trial she said Nicole was sitting on Randy's lap. When his mother came in she got off and sat between them on the bed.

[13] Randy testified at the bankruptcy trial that the reason Bonnie drove was because he had too much to drink.

Because the truck had only two bucket seats in the front and no back seat, and because Bonnie was driving, for some period of time Nicole sat on Randy's lap on the passenger side.[14] Her back was to the door, her legs toward the driver's seat, and the left side of her face toward Randy. According to both Bonnie and Randy, Nicole had her hands all over him. Bonnie specifically mentioned that Randy was trying to get away from Nicole because Bonnie remembered him crowding her, making it difficult for her to shift the manual transmission.[15] Although at the bankruptcy trial Randy said he spat at Nicole in order to get her to stop touching him, in the criminal action both he and Nicole said he kissed her ear.[16] Bonnie did not recall Randy's spitting at Nicole.

Randy, Bonnie and Nicole stopped at Bonnie's house to get some compact discs.[17] They then ventured on to a gas station where Bonnie left Randy and Nicole in the truck for less than five minutes while she ran into the store to purchase a liter of Mountain Dew for Nicole and some Frappuccino to mix with the Hot Damn 100, for herself and Randy. The group then headed to Colby Trails on nearby state land to drive down to a lake. Like many other facts in this story, it is not clear whether they made it to the lake, or whether the presence of law enforcement vehicles at the trailhead dissuaded them from entering.[18]

---

[14] In the bankruptcy trial, Randy said Nicole started out on his lap, but he was uncomfortable and moved to the console. Nicole claimed he started out on the console but was uncomfortable, and then moved to the passenger seat with her on his lap. Bonnie testified that when they first got in the truck Randy was on the console, but on the way back Randy was on the seat with Nicole on his lap.

[15] Randy testified that his truck had an automatic transmission.

[16] Although at both the criminal and bankruptcy trials Nicole claimed not to remember whether Randy kissed her in the truck, at the Preliminary Examination on July 16, 2002, she said he kissed her twice on her left ear while in the truck. Randy asserted at the criminal trial that he kissed her on her left ear once in the Hut and another time in the truck.

[17] At the bankruptcy trial, Randy did not recall this stop.

[18] In both trials, Nicole claimed they did not go into Colby Trails because they saw one or more police cars and decided to return to the Hut. Also, in both trials, Bonnie maintained they went to the lake, sat in

Everyone agrees they arrived back at the Hut about 8:45 p.m. and it was dusk. Bonnie says she and Nicole left at the same time, which was just shortly after dark. Bonnie also claims Nicole followed her down the driveway and they both had their headlights on. Bonnie said she headed north on M-66 toward Edmore, while Nicole went south on M-66 toward Stanton. Just before turning right onto McBride Road, Bonnie glanced in her rearview mirror and saw Nicole's taillights continuing south on M-66. Gail corroborated this testimony by stating that she noticed both cars leaving the driveway before 9:30 p.m. According to Gail, one went north and one went south. No one returned that evening.

### A. Nicole's Testimony

Nicole's account of what happened at the Hut after the trio returned from Colby Trails differs dramatically from other accounts. Nicole agrees that Bonnie left slightly after dark, but claims she stayed behind because Randy told her he wanted to show her something behind the house. After removing his t-shirt and hanging it on a metal post outside the Hut, Randy and Nicole walked back into a clearing in the wooded part of his parents' property. He showed her the ruins of a trailer that Randy's brother reportedly "shredded" because he was angry with the government. While on the walk, Nicole claims Randy was inappropriately grabbing her. She resisted his advances, and blamed this behavior on the Hot Damn 100. She said the entire walk, man-handling, and trailer-inspection took one to three minutes.

---

the truck drinking and left about an hour and a half later. In the bankruptcy trial, Randy said they did not go in, while in the criminal trial he said they did.

According to Nicole, Randy appeared to be quite intoxicated, to the point where he was having trouble walking. Nicole claims she was concerned that Randy would not wake up in time to go to work the next day because he was so drunk. Therefore, although he had been inappropriately and offensively groping her on their short walk, she decided to re-enter the Hut to set his alarm clock for him so he would not be late for work. As she was kneeling over his bed to do this favor for him, she says Randy allegedly put his leg between her legs and flipped her onto her back and onto the bed. She says he then pressed his forearm to her throat and started taking off her pants with his other hand. She protested and told him to stop, but each time she struggled or said anything, he got rougher, and she feared he would choke her. Her resistance ceased. He allegedly managed to get one pant leg off and slid her underwear to the side. During the alleged assault and violent intercourse, Nicole claims a lamp and a glass ashtray were knocked off the bedside table and may have broken.

Nicole testified that after about five to six minutes of alleged penis to vagina penetration *sans* condom, while rocking vigorously, slamming her back against the backboard of the bed, calling her Bonnie, kissing her neck, and sucking or licking her entire left ear, Randy allegedly put his genitals in her face and demanded oral sex. After she refused, he allegedly rolled her over so she was on top of him. At this point, she says, she was able to make her escape. She managed to put her pant leg back on, put her toes in her shoes, grab her belt and hop or run out of the Hut. Nicole claims Randy was able to stay right behind her, even though he was reportedly too drunk to set his alarm clock or walk minutes earlier. As she passed the post where Randy had left his t-shirt, she grabbed it and threw it at him in an attempt to slow him down. He caught it

and kept running behind her. Randy was allegedly telling Nicole to calm down and trying to stop her from running away. Randy beat her to the car, but somehow she managed to get in it anyway, even though she could not close the car door because Randy stood between it and the passenger compartment. She was afraid she would knock him down if she put the car in reverse, so she waited, evidently for his safety. He was urging her to calm down, when he told her she couldn't leave until she kissed him good-bye. He bent over and kissed her on the lips, but she did not kiss him back. She left immediately thereafter.

When asked whether she screamed during the alleged rape, or afterward as she was running to her car, Nicole replied that she didn't because she was afraid Randy's young niece would be the one to respond and Nicole did not want to upset her.

On her way home, Nicole stopped by the side of the road, allegedly to collect herself. She said she was suffering from intense back pain, abdominal cramping, and numbness in her leg. She called Tom from a cell phone and told him something horrible had happened, but she did not go into details. Tom told her to come to his house. She made her way there, passing the Stanton police department enroute. Upon entering Tom's trailer, Nicole collapsed, reportedly due to the numbness in her leg and presumably due to her emotional state, and crawled to the bathroom. She wanted to take a bath or shower, but she neither showered nor bathed at that time. Instead, after Tom's further coaxing, Nicole revealed her version of the night's events, including the rape.

Tom called the police at 11:08 p.m. Def. Exh. A., Page 1. Deputy Grill from the Montcalm County Sherriff's Department arrived at Tom's house and interviewed Nicole at 11:30 p.m.


B. Randy's Testimony

Meanwhile, Randy claims that immediately upon Bonnie's and Nicole's simultaneous departure, he went directly to bed, and did not leave the Hut until the next morning when he went to work. He disputes they went for a walk in the woods or that he had a violent or sexual encounter of any kind with Nicole.  He refutes Nicole's other contentions, including that he owns an alarm clock. His mother and Bonnie agreed that Randy never had an alarm clock. Deputy Grill did not notice one upon his later inspection of the Hut, even though it figured prominently in Nicole's statement to him and Nicole described it as being about the size of a box of tissues. Indeed, Deputy Grill said that if there had been an alarm clock, he would have seen it.  According to Randy, instead of an alarm clock he uses a television with a built-in clock and timer, to wake in the morning and get to sleep at night. Randy also claims he does not have a glass ashtray, and his lamp is not broken.

Randy also says that when he, Bonnie, and Nicole returned from the truck-ride to Colby Trails, Nicole offered to spend the night with him, but he refused. Instead, he

offered her a place to sleep on the couch, but was adamant that he was going to bed because he had to work the next day. Nicole petulantly decided to go home.[19]

In addition, Randy says that upon discharge from the mental hospital, he received two medications. One was Effexor -- an anti-depressant -- and the other was Trazodone, a sleeping aid. As a side-effect in some male patients, Effexor hinders one's ability to become sexually aroused. Nurse Shattuck confirmed, after consulting an authoritative medical text, that erectile dysfunction is a possible side-effect in some male patients. Randy claims he suffers from this side effect and cannot get an erection. Gail corroborated this by testifying that, prior to the alleged rape, Randy approached her and her husband, a chiropractor, complaining of his inability to get an erection. Nurse Shattuck also confirmed that alcohol provokes impotence. Randy agreed he had been drinking, and Nicole claimed he was substantially inebriated. Randy testified that, given the side-effects of his medication and the amount he had been drinking, penetration would have been impossible.

### C. Tom's Testimony

Tom testified that he saw Nicole three or four times on June 7, 2001. He had not seen much of her in the previous week to ten days because, as a truck driver, he was on the road most of the time. He said he and Nicole had a very trusting relationship, so

---

[19] Even though Bonnie was present at the time of Nicole's proposition, she does not recall hearing it. In the criminal trial, Randy asserted that Bonnie wanted to get her CDs out of the truck but could not find the keys she misplaced. At the time of the alleged discussion, Bonnie was busy looking for them and was back and forth inside and outside the Hut.

when she said she was going to see friends that night and left about 4:30 p.m.,[20] he was not upset and did not tell her she had to be back at any certain time.   Tom and Nicole had separate dwellings at that time.

Tom claims he received a call from a distressed and agitated Nicole at about 9:30 p.m. that night. When Nicole arrived at approximately 10:30 p.m., she fell to the floor and was very distraught. She was crying and devastated. After some coaxing, she told him what happened. She did not want to call the police because she was afraid no one would believe her, but Tom insisted. The police arrived about 15 minutes to a half an hour after his call. Deputy Grill took Nicole out on the driveway for about 30 to 40 minutes and interviewed her. Then they all proceeded to the hospital emergency room where Tom thought they arrived at about 11:00 p.m.[21] From there they went back to his house to get more clothes for Nicole, then to Burger King to get some food, and on to the YWCA, arriving by his estimation, at Midnight.[22]

### D. Deputy Grill's Testimony

When Deputy Grill arrived at Tom's house at 11:30 p.m. on the night of June 7, 2001, he found Nicole upset, her eyes red from crying. Deputy Grill reported that in her original statement to him, Nicole described Bonnie's departure and the night's events, including how she and Randy took a walk in the woods, how she attempted to set the alarm clock, how he got her onto the bed,[23] and the alleged rape itself.   There are

---

[20] In the criminal trial, Tom testified that Nicole left his house around 5:00 p.m. or 6:00 p.m.

[21] According to the Emergency Room Report, they arrived at 12:15 a.m. Pl. Exh. 15.

[22] According to Nurse Shattuck's Report they arrived at the YWCA at 2:00 a.m. Pl. Exh. 11.

[23] She said Randy picked her up and threw her on the bed. He then jumped on top of her.

14

noticeable variations between her statements to Deputy Grill and her testimony in the bankruptcy trial.

According to Deputy Grill, Nicole complained of back pain caused by Randy's throwing her on the bed. The Deputy accompanied Nicole and Tom to the emergency room of United Memorial Hospital in Greenville. Hospital staff examined her quickly and either Nicole requested to go to the YWCA in Grand Rapids, or the emergency room staff sent her there for further examination using a "rape kit." The emergency room doctor stated in his report that Nicole did not appear to be in mental distress. Nicole also told the emergency room doctor that she was not "physically hurt, pushed or beat up." Pl. Exh. 15, pg. 1. At trial Nicole testified that her rape-related back pain was excruciating, and that her cramping was comparable to contractions during labor and childbirth. There was no suggestion in the emergency room physician's report of any findings regarding this degree of back, leg or abdominal discomfort, though it would have been natural for Nicole to report the excruciating nature of the pain to medical personnel. It would also be natural for trained personnel to report the pain as something more than "burning in the vaginal area and soreness in her low back" as reflected in the Emergency Room Report. Pl. Exh. 15.   Indeed, had Nicole made such a report, it seems likely that the physician who met with her would not have released her as quickly as he did.  In the report, the emergency room physician diagnosed "sexual assault" after speaking with Nicole, reviewing her vital signs (such as temperature and blood pressure), but without administering a rape kit or conducting the head-to-toe forensic exam that he evidently assumed would occur at the YWCA later that night.

After the emergency room visit concluded, Officer Grill did not accompany Nicole and Tom further, leaving them on their own to go back home to get clothes and drive to the YWCA for further examination.

### E.  Nurse Shattuck's Testimony

According to Nurse Shattuck, she and an unidentified victim advocate met Nicole and Tom at the YWCA at 2:00 a.m. on June 8, 2001, since they were on-call that night to assist and examine sexual assault victims. Nurse Shattuck testified that it is routine for her to first do a therapeutic intake procedure. This includes asking the patient questions about the incident and taking notes. She said Nicole directly answered all her questions and appeared to be alert and not so upset that she did not know what she was saying. Nurse Shattuck was careful to explain to the court that there is no typical way for any rape victim to behave in the aftermath of a rape and during the intake interview. In her report, Nurse Shattuck quoted Nicole as saying, "A guy I know was drunk, so I gave him a ride home and helped him in the house. He pulled my pants down and had sex with me." She also said Randy had held her down, and while raping her he had kissed her neck, mouth and left ear. Nicole also said the last time she had consensual sex was two or three days earlier. Nurse Shattuck reported there was no evidence that Nicole had been drinking. Nicole told Nurse Shattuck that the rape had occurred at about 10:20 p.m. on June 7, 2001.

Next, as was her practice, Nurse Shattuck performed a head-to-toe forensic exam using a dual-wave length body scanner on Nicole's upper body[24] to detect any type of body fluid, causing the fluid to glow or fluoresce. The only fluid that fluoresced on Nicole's upper body was behind her left ear. Nurse Shattuck testified that it was a round glob concentrated in one spot, and that the glob was not consistent with spitting because there was no spray in the area around the glob – spray that the body scanner would have detected. She could not say, however, whether the glob was more consistent with kissing or spitting. Later forensic testing of the glob that Nurse Shattuck collected from behind Nicole's ear identified the substance as saliva containing Randy's genetic material or "DNA."[25] The parties stipulated that this was the only evidence of Randy's DNA found anywhere on Nicole's body.

Again according to usual practice, before doing a more intrusive exam, Nurse Shattuck performed a gross visual examination, and took photographs. Her visual examination revealed no evidence of injury to Nicole's upper body where Randy allegedly held her down with his forearm. Next, she used a culpa scope, a device that magnifies the vaginal area. She also applied a dye to Nicole's vaginal area to highlight freshly-injured tissues that have not yet started to heal. The dye revealed a one centimeter tear in Nicole's perineum which, according to Nurse Shattuck, indicated blunt force trauma such as something pushing on it where the capacity for stretching is exceeded. Nurse Shattuck testified that this wound was somewhat abnormal in a rape situation because the trauma is usually found higher up and that the perineum is not an

---

[24] She did not scan Nicole's pubic area because body fluids typically fluoresce in a woman's pubic area regardless of any sexual activity or attack.

[25] On February 21, 2002, after obtaining a search warrant, Officer Corwin from the Montcalm County Sherriff's Department accompanied Randy to have his blood drawn for DNA testing.

area typically involved during sexual intercourse. Nurse Shattuck further testified that Nicole's labia minora was red and tender to the touch and her cervix was oozing a small amount of blood. The bleeding cervix did not alarm Nurse Shattuck as it was very slight and could be consistent with Nicole's tardily taking her birth control medication. As for the reddening of the labia minora, Nurse Shattuck could not explain how it happened or when the reddening first occurred, especially in light of the fact that everything else – Nicole's labia majora, vagina, hymen and anus -- were all within normal limits. However, she did say that there was debris on Nicole's labia minora. She took a sample and tested it. It was not hair, sperm or human material. The source and identity of the debris is unknown.

Regarding the lack of reproductive fluids or hair from Randy, Nurse Shattuck said it was not uncommon for there to be a lack of sperm, seminal fluid or pubic hair found on a rape victim's body or clothes. She further stated that the physical evidence found on Nicole's body was as consistent with consensual sex as nonconsensual sex.

F.  Nicole's Supplemental Statements to Deputy Grill

On June 8, 2001, Nicole called Deputy Grill with more details of the alleged rape. She supplemented her report four more times throughout the next year, the last supplement occurring on June 25, 2002 – more than one year after the incident. By that time, Nicole had seen the police report and wanted to make a few corrections. Significantly in the court's view, Nicole's June 25, 2002 supplemental report was the first time she told authorities that Randy demanded oral sex.  She had never mentioned this

in all the statements she made throughout the previous year. In addition, Nicole said that as she was escaping from Randy, she glanced at the Main House and happened to notice there was no one standing in the large picture window. Last, she said it was still fairly light outside when she left.

It is unclear whether Nicole knew this at the time of her final supplementation, but on June 18, 2002, Deputy Grill had sworn out a felony warrant for CSC3 against Randy and arrested him. Def. Exh. A, pg. 12. Randy remained in the Montcalm County Jail for several weeks until he was able to post bail.

V.    Findings of Fact and Conclusions of Law

The statutory exception to discharge upon which Randy relies provides in relevant part as follows:

> (a) A discharge under section 727 of this title does not discharge an individual debtor from any debt –
>
>     *               *               *
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 523(a)(6). Under Supreme Court and Sixth Circuit precedent, a willful and malicious injury as defined by 11 U.S.C. § 523(a)(6) has not occurred unless the actor desires to cause the consequences of his act, or believes that the consequences are substantially certain to result from it. Kawaauhau v. Geiger, 523 U.S. 57 (1998); see

also In re Kennedy, 249 F.3d 576, 580 (6th Cir. 2001).    The Sixth Circuit has determined that debts arising out of the intentional infliction of emotional distress, malicious prosecution, false arrest and abuse of process satisfy the willful and malicious injury standard of 11 U.S.C. § 523(a)(6). Steier v. Best (In re Best), 109 Fed. Appx. 1 (6th Cir. 2004); Abbo v. Rossi, McCreery & Associates, Inc. (In re Abbo), 168 F.3d 930 (6th Cir. 1999).

First, the court finds the testimony of Nurse Shattuck and Deputy Grill to be absolutely credible and very helpful.  The other witnesses' testimony, although on some points credible, was largely biased, inconsistent, and mostly self-serving.  Randy's testimony, presented with considerably more conviction than his imperfect recollection warranted, impressed the court as largely unreliable. Defendants' counsel did a fine job of discrediting him with inconsistent statements from prior testimony in the criminal proceeding, and during his deposition in this proceeding.  The court attributes Randy's shortcomings as a witness to the passage of time, years of marijuana and alcohol consumption, and indignation for the harm he suffered as a result of the charges. Bonnie, a self-described "drunk" at the time of the events in question, was slightly more credible, though her recounting of some details left considerable room for improvement. Gail, though likely biased in her son's favor, conducted herself as a credible witness. The slight inconsistencies in her version, such as her initial failure to report her observation of Nicole's hands down Randy's pants when she came upon the trio in the Hut, probably flowed from a mother's embarrassment and her assumption, incorrect as it turned out, that nothing would come of Deputy Grill's initial investigation.

Nevertheless, the best evidence that Randy offered in support of his case was the physical evidence (or lack of physical evidence) gathered by Nurse Shattuck, her contemporaneous report, the contemporaneous reports of the emergency room personnel, and Deputy Grill's investigative summary.    The parties stipulated that the only evidence of Randy's DNA on Nicole's body was saliva behind Nicole's ear. There was absolutely no other physical evidence linking Randy to the crime even though Randy wore a beard (in court, and at the time of the incident), and appeared to have a fair amount of body hair.

From the dearth of physical evidence corroborating Nicole's version of events or even connecting Randy to the crime for which he was acquitted, and from Nicole's inherently incredible and changing story, the court finds that Randy probably did not rape Nicole.    Specifically, Nicole's testimony of the alleged assault painted a vivid picture of violent sexual activity, vigorous rocking back and forth, banging against hard surfaces such as the bed frame, and increasing pressure that Randy applied to Nicole's chest and neck area that caused her to cease resisting.  Yet, and quite significantly in the court's view, the medical personnel, including Nurse Shattuck, found no evidence of injury to Nicole's upper body, back, or legs, and only slight tearing in the perineum that was not consistent with sexual intercourse.  The court infers that such tearing may have been caused by speeding down Montcalm County's secondary roads in a truck, while somehow sharing a single bucket seat with Randy, legs stretched across the console. Although she complained to emergency room personnel about back soreness and vaginal burning, she stated she was not "physically hurt, pushed, or beat up."  Indeed, she was initially reluctant to seek medical intervention at all, though at trial described

21

the pain as excruciating and comparable to childbirth. Much of her conduct and all or her statements on June 7-8, 2001 are not consistent with her hyperbolic trial testimony regarding the pain.

Nurse Shattuck collected a single glob of Randy's DNA from Nicole's person. As Nicole described the incident, Randy's shirt was off at the time, and the physicality of the alleged attack was so pronounced that one would expect to find at least some hair from Randy. Notwithstanding Nurse Shattuck's view that limited body fluid from the attacker is not inconsistent with rape, one would have expected the rape kit and YWCA examination to uncover more DNA debris than a single glob of saliva behind Nicole's ear. The absence of hair is even more remarkable given Randy's beard and other hair, and the fact that he had earlier removed his shirt and, as Nicole reported to Deputy Grill, was naked when he chased her to the car. Moreover, Nicole's testimony that Randy had her ear entirely within his mouth, and was licking it; her statements that she did not wash after the alleged attack; her stipulation and Nurse Shattuck's finding that the only saliva detected was an isolated glob *behind* her ear – all undermine her credibility. If the incident occurred as Nicole described it, the physical remnants of Randy's role would have been legion, not limited.

With the help of Nurse Shattuck's expert testimony, the court reviewed the photographs of Nicole's vagina, cervix, and environs, and considered the blue areas of dye "uptake" that were evident in the photos, most of which were naturally occurring veins. After reviewing the photographs, Nurse Shattuck testified, credibly, that the images were equally consistent with consensual or non-consensual sex. Yet, again if Nicole's depiction of the violent rocking back and forth "really, really hard" and slamming

against the bed frame for five or six minutes, and the penetration as feeling like he was "stabbing me with a knife," were true, surely the photographs would show more damage.

Nor did Nicole's changing timeline of significant events lend credence to her story. Everyone including Nicole testified she left the Hut at dark or shortly thereafter. Tom testified she called him at 9:30 p.m., yet she told the emergency room and Nurse Shattuck, the rape occurred at 10:20 p.m. Later, she told Deputy Grill it was still light out when she left the Hut after the alleged rape, though the sun set that day at 9:18 p.m. Taking everyone's testimony, including Nicole's as true, Bonnie left just after dark, or about 9:30 p.m. Nicole said the walk in the woods lasted no more than three minutes. If she re-entered the Hut as she testified, and the rape occurred as quickly as she testified, there is an unexplained gap in time. Throughout her testimony Nicole repeatedly stated she was not good at explaining things. This apparently includes distances, time frames and spatial descriptions. Unfortunately, this lack of narrative acumen makes it nearly impossible for her to communicate a credible story.

For example, in her statement to Deputy Grill she said Randy threw her on the bed and jumped on top of her. To Nurse Shattuck she said she gave a guy she knew a ride home because he was drunk and he had sex with her, creating the impression of events quite different from the joy-riding and violent encounter she described at trial. In a third description, she said Randy flipped her onto the bed. Likewise, her description of Randy's state of sobriety shifts from one version of the story to the next: before she re-enters the Hut, he is so inebriated he is having trouble walking and cannot be trusted to set his own alarm clock (visible only to her), but minutes later he is able to pick her up

or flip her over and then win the race back to her car, even though his speech was slurred and incomprehensible minutes earlier. Although she said he reached the car first, somehow she was in the car when he got there.

The fact that Nicole did not call 911 or stop at the Stanton Police Station on her way home, even though she drove right by it, also troubles the court, but is not inconsistent with the reluctance of some sex crime victims to come forward. Yet, the fact that Nicole elected not to scream upon exiting the Hut -- at the expense of her own safety for fear that Randy's niece would come upon the scene -- is patently incredible. Probably the most damning evidence, other than the lack of persuasive physical evidence of Randy's forcible, vaginal penetration as alleged, is Nicole's delay of more than a year in reporting a major part of the alleged violation – the allegation that Randy demanded oral sex -- and her convenient recollection that she had the presence of mind to look at the picture window in the Main House and observe that no one was watching her as she was supposedly being chased by a naked Randy. These eleventh-hour additions strike the court as a sophomoric attempt to bolster Nicole's rather thin case against Randy after prosecutors failed to move against him for over a year, at least as far as Nicole was aware at the time she supplemented her statements.

Throughout her testimony, Nicole tried to portray herself as an exceedingly considerate victim, setting the alarm clock for him after he groped her, not throwing the car into reverse for fear of harming her supposed rapist, not screaming for fear of upsetting his niece. Her perception of herself does not seem believable given the events she described.

For these reasons, the court finds it is most likely that Randy did not rape Nicole. Accordingly, the court finds that Randy has met his burden of proving, by a preponderance of the evidence, that Nicole willfully and maliciously injured him by causing him to be wrongly prosecuted and incarcerated through her false allegations of rape. Months earlier, Tom had been released from jail for a similar conviction and was still on probation at the time of Nicole's allegation against Randy. Therefore, Nicole likely had first-hand knowledge that rape charges carry serious consequences. Accordingly, the court finds that Nicole desired to injure Randy or at least believed that her allegations were substantially certain to injure Randy.

As to Tom, however, the court finds no evidence linking him to the false accusation of rape, or that he colluded with Nicole to abuse the legal process. The facts show that Tom received a phone call; that he drove Nicole to the various medical facilities; that he believes her version of the facts; and that he stands by his wife. Otherwise, the evidence regarding Tom is sparse. On such a slim showing, the court is unwilling to infer Tom's complicity in Nicole's duplicity. The court finds that Randy failed to prove Tom had anything to do with Nicole's allegations and her abuse of the legal process in pursuing false criminal charges.

As the court found when it denied the Defendants' motion for summary judgment, the state court's Judgment set Randy's damages at $143,925.50, divided equally between Tom and Nicole. For the reasons stated above, the court finds that the $71,962.75 damage award embodied in the Judgment against Nicole is excepted from discharge in her bankruptcy. However, because Randy proved no cause of action

against Tom, the $71,962.75 damage award embodied in the Judgment as to Tom shall

be discharged in his bankruptcy.

The court will prepare a separate judgment to this effect.


Date: March 25, 2009


Scott W. Dales
United States Bankruptcy Judge